IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Thomas C. Siefert, :

Plaintiff, :

v. : Case No. 2:16-cv-162

: JUDGE ALGENON L. MARBLEY

Commissioner of Social Security, Magistrate Judge Kemp

Defendant. :

REPORT AND RECOMMENDATION

I. Introduction

Plaintiff, Thomas C. Siefert, filed this action seeking review of a decision of the Commissioner of Social Security denying his application for disability insurance benefits. That application was filed on May 14, 2013, and alleged that Plaintiff became disabled on May 10, 2010. That date was later amended to May 16, 2013.

After initial administrative denials of his claim, Plaintiff was given a hearing before an Administrative Law Judge on December 8, 2014. In a decision dated March 9, 2015, the ALJ denied benefits. That became the Commissioner's final decision on December 30, 2015, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on June 20, 2016. Plaintiff filed a statement of specific errors on August 4, 2016. The Commissioner responded on November 23, 2016 and Plaintiff filed a reply brief on December 7, 2016. The case is now ready to decide.

II. Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 61 years old as of the date of the hearing and who has a twelfth grade education, testified as follows. His testimony appears at pages 43-76 of the administrative record.

First, Plaintiff was asked about the last time he worked. He responded that he last worked a 40-hour week in May, 2010, and went part-time after that. He eventually stopped working in May of 2013. He worked at a hardware store that he had once owned but which had been placed in his wife's name in 2010. Plaintiff waited on customers and occasionally ran the cash register. He had done some work for Schodorf Truck Body from 2005 to 2007, acting as a customer liaison. He did not normally work a full 40-hour week in that position. Other jobs he held included selling trucks and being a shop manager and sales person for an equipment company.

When asked why he could no longer work, Plaintiff said that he had problems with his knee, with venous insufficiency, and with panic attacks and depression. He needed knee surgery but could not afford it. He rated his pain as a ten out of ten on some days, but medication reduced it to a six or a seven. Plaintiff would not take narcotic pain medication, but used Excedrin and Tramadol and also tried a wrap and ice, but those treatments did not help much. He had a cane and a walker prescribed for him because he fell several times. His family doctor, Dr. Trapp, had also prescribed medication for his anxiety and depression, and he was also attending therapy sessions. He did have a gap in treatment when he was feeling fairly well, but had started again before the hearing.

Plaintiff was asked to describe his anxiety attacks. He testified that they began in the stomach area and then "started working on my brain." At times he would simply be afraid to do anything. Lying down and relaxing, and then taking his medication, would help. He experienced attacks two or three times weekly. He also testified that he could lift ten pounds with his left hand and do some laundry. Plaintiff could manage his own finances and do some pet care. At times, his legs would

swell and require him to elevate them. He was also easily distracted and was uncomfortable in large groups of people (more than 12).

## III. The Medical Records

The pertinent medical records are found beginning at page 270 of the record. They can be summarized as follows. Because Plaintiff's two claims of error relate only to his physical impairments, the Court will limit its review to records related to that issue.

Plaintiff had his right knee x-rayed on August 23, 2010. The study showed some spurring about the lateral compartment and at the patellofemoral articulation. Dr. Meyer, who read the x-ray, interpreted it to show degenerative changes, but chondromalacia could not be excluded. (Tr. 329). Notes from Plaintiff's treating physician, Dr. Trapp, show a diagnosis of osteoarthritis as early as 2010. (Tr. 330-32). A 2013 x-ray showed a slight progression in this disease. (Tr. 339).

On September 30, 2013, Dr. Trapp completed a multi-page questionnaire relating to Plaintiff's functional capacity. The important findings on that questionnaire are that Plaintiff could not lift more than ten pounds (and could only do that occasionally), could only sit, stand, and walk for short periods of time, and had to lie down for four hours a day. He also had to use a cane to walk and had extreme limitations on the use of his right hand and arm due to the need to use a cane. Dr. Trapp further concluded that Plaintiff could not tolerate humidity, wetness, extreme cold, and vibrations, and could not walk a block on uneven surfaces. (Tr. 333-38).

On August 21, 2014, Dr. Trapp filled out a form relating to section 1.02A of the Listing of Impairments. On that form, he said that Plaintiff had a major dysfunction of a weight-bearing joint (his right knee) characterized by swelling, pain, and

painful ambulation, that he had chronic pain and stiffness in that joint, that he could not fully bend or straighten his knee, and that he could not walk a block at a reasonable pace, use standard public transportation, do routine activities like grocery shopping or banking, or climb several stairs at a reasonable pace with use of a handrail. Dr. Trapp reiterated that Plaintiff required a cane. (Tr. 340-41). He also provided a copy of the prescription he had written for that cane on June 20, 2014, and a copy of a prescription for a walker written on October 28, 2014. (Tr. 342, 394).

The only other pertinent records are some notes from Dr. Trapp’s office for what are described as “routine visits” which took place in 2013 and 2014. They all contain the same notation about Plaintiff’s knee as the note from 2010, which reads as follows: “Knees: General/bilateral: No tenderness on palpation of the knee. Knee motion was normal. No pain was elicited by motion of the knee. Right knee: Examined.” (Tr. 368-88). There is also a letter from a counselor dated October 29, 2014 stating that she observed that Plaintiff appeared to be in a great deal of pain from his knee, walked with a cane, and had great difficulty getting up after a 60-minute counseling session, needing her help to get out of the chair. (Tr. 391).

The records were reviewed by state agency physicians. The first, Dr. Hughes, concluded that Plaintiff could do a range of light work with some restrictions, and commented that it was unclear why Plaintiff was using a cane when his gait and station were normal. (Tr. 98-100). The second, Dr. Das, thought Plaintiff could do medium work with some limitations. In her opinion, which is dated September 16, 2013, she cited, as an explanation for the exertional limitations she imposed, “walks with a cane.” (Tr. 111-12). Both evaluations predate the two opinions given by Dr. Trapp.

## IV. The Vocational Testimony

Dr. Michael Klein was called to testify as a vocational expert at the administrative hearing. His testimony begins at page 77 of the administrative record.

Dr. Klein first testified about Plaintiff's past work. He said that the job of retail sales attendant was light and semi-skilled. Plaintiff also worked as a retail manager, which was light and skilled; the same was true of his jobs as a truck body salesperson and a service writer, although if the service writer jobs also involved running a parts department, it could have been medium or even heavy.

Dr. Klein was next asked questions about a hypothetical person with Plaintiff's age, education, and experience who could perform light work but could kneel, crouch, and climb ramps and steps only occasionally and could never crawl, climb ladders, ropes or scaffolds. The person also had to avoid workplace hazards such as unprotected heights and moving mechanical parts. According to Dr. Klein, such a person could do Plaintiff's past retail sales and management jobs as well as the truck body sales job. He or she could also work as an assembler, desk clerk, and marker or labeler. If the person also could do only simple, routine tasks and not at a production rate pace, the assembler job would be eliminated, but the desk clerk and marker or labeler jobs would remain.

Lastly, Dr. Klein testified that someone who could only sit, stand, and walk for up to four hours in a workday, and who had to lie down every four hours, could not be gainfully employed. Also, if someone who could otherwise do light work had to use a cane, that person could not do any of Plaintiff's past jobs or the other light jobs Dr. Klein identified.

## V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 12-

31 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff meets the insured status requirements of the Social Security Act through June 30, 2018. Second, she found that Plaintiff had not engaged in substantial gainful activity since his amended alleged onset date. Going to the next step of the sequential evaluation process, the ALJ concluded that Plaintiff had only two severe impairments: right knee osteoarthritis and obesity. The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff could perform light work but could kneel, crouch, and climb ramps and steps only occasionally and could never crawl, climb ladders, ropes or scaffolds. He also had to avoid workplace hazards such as unprotected heights and moving mechanical parts.

With these restrictions, the ALJ concluded that Plaintiff could still perform his past jobs of retail sales attendant, retail manager, and truck body salesperson. That finding is inconsistent with a determination of disability. Consequently, the ALJ decided that Plaintiff was not entitled to benefits.

## VI. Plaintiff's Statement of Specific Errors

In his statement of errors, Plaintiff raises these issues: (1) the ALJ erred by not considering whether Plaintiff's physical impairment met or equaled Section 1.02A of the Listing of Impairments; and (2) the ALJ's residual functional capacity finding did not account for Plaintiff's use of a cane. These issues are evaluated under the following legal standard.

Standard of Review. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the

Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

A. Section 1.02A

Plaintiff acknowledges that the ALJ analyzed his knee impairment under Section 1.02A. However, he argues that the ALJ did not compare the relevant evidence to the criteria enumerated in the Listing.

The ALJ correctly recited the requirements of this section of the Listing, which reads:

> 1.02 ***Major dysfunction of a joint(s) (due to any cause)***: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous

> ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
>
> OR
>
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

Section 1.00B2b, to which this section refers, says that the inability to ambulate effectively is "an extreme limitation of the ability to walk" which consists of "having insufficient lower extremity functioning ... to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." Ineffective ambulation includes, but is not limited to, "the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail."

In analyzing Plaintiff's knee condition, the ALJ made several key findings. First, she said that the record did not support a finding of "gross anatomical deformity" of the knee because there was "no evidence of joint space narrowing, bony destruction or ankylosis," citing to Exhibit 5F, p. 10, which is the 2010 x-ray showing only degenerative changes to the knee, and

to Exhibit 8F, which is the 2013 x-ray. (Tr. 23). Second, she found that there was no evidence that Plaintiff needed either two canes or crutches in order to walk. After noting that Plaintiff had been prescribed a cane, she pointed to records showing that he had normal gait and station through at least April, 2013, that his physical examinations produced mostly normal findings, and that his knee was stable with normal range of motion through September, 2014. She also relied on the x-rays, which showed only mild progression of his disease since 2010, and Dr. Pratt's statement in September, 2013 that he needed only a single cane. She acknowledged that he had been prescribed a walker in October of 2014 and also acknowledged, at least implicitly, that Dr. Pratt had completed the questionnaire about section 1.02A, but found that his "opinions are ... inconsistent with the totality of the evidence, which reflects normal gait and station and musculoskeletal and neurological findings with no evidence of subsequent traumatic event or diagnostic imaging necessitating the use of an ambulatory aid." (Tr. 23). It appears from this language that she rejected Plaintiff's claim that he needed even one cane - a cane being an "ambulatory aid" - but because the need to use two canes, crutches, or a walker is a required element of disability under section 1.02A, she found he did not qualify for disability under that part of the Listing.

Plaintiff attacks this analysis as ignoring the opinion of Dr. Trapp. He notes that Dr. Trapp said, contrary to the ALJ's findings, that Plaintiff did meet the various criteria for disability specified in section 1.02A, including an inability to ambulate effectively and the need to use a walker, and that the ALJ had no basis for rejecting his conclusions. Plaintiff also asserts that the x-rays in question did show bony destruction (*i.e.* osteoarthritis) and that the ALJ was simply wrong when she said they did not. The Commissioner responds that moderate osteoarthritis and joint effusion do not meet the definition of

“joint space narrowing, bony destruction or ankylosis” and that the absence of this prerequisite for disability under section 1.02A is enough to support the ALJ’s findings. Additionally, the Commissioner points out that at least as late as September, 2013, Dr. Trapp affirmatively stated that Plaintiff did not need two canes, crutches, or a walker, meaning that he was able to ambulate effectively, and that both state agency reviewers concluded that his condition did not satisfy section 1.02A.

Whether a Listing has been satisfied is primarily a medical issue. The parties disagree about whether the x-rays show joint space narrowing or bony destruction. The ALJ found they did not. Dr. Pratt appeared to imply that they did. The Court has searched the state agency reviewers’ opinions for any evidence that they either saw the two x-rays in question or conducted any analysis of section 1.02A, and can find none. Without some interpretation of the x-ray evidence one way or the other, the Court agrees that the ALJ’s conclusion on this part of the Listing is not supported by substantial evidence.

As to the inability to ambulate effectively, the Court agrees that the ALJ’s analysis is incomplete. Walking with two hand-held assistive devices is not the only way to satisfy that criterion. Section 1.00B2b explicitly says that examples of such an inability “include, *but are not limited to*, the inability to walk without the use of a walker, two crutches, or two canes....” (Emphasis added). The ALJ quoted this language (Tr. 22) but then failed to conduct any analysis of the other possible ways in which Plaintiff might not be able to ambulate effectively, even though Dr. Pratt had expressed opinions about them. The general rejection of Dr. Pratt’s opinion on this Listing without making mention of these specific portions of it is not sufficient to satisfy the ALJ’s duty to provide good reasons under 20 C.F.R. §404.1527(c). Because of that omission, the Court and the Plaintiff may well be left with the impression that the ALJ

either did not appreciate the fact that Dr. Pratt had an opinion about whether Plaintiff could, for example, walk a block at a reasonable pace over an uneven surface or use standard public transportation, or did not provide any reasons for rejecting those opinions. Cases like Rogers v. Comm'r of Social Security, 486 F.3d 234, 242 (6th Cir. 2007) and Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004) explain that this uncertainty is precisely the problem that §404.1527(c) was aimed at preventing. Consequently, there is a need for a remand so that the issue of whether Plaintiff's knee condition met the criteria for disability under Listing section 1.02A can be further developed.

B. Use of a Cane

As his second statement of error, Plaintiff contends that the ALJ did not properly evaluate the evidence that he needed to use a cane. For many of the same reasons discussed above, the ALJ gave no weight to Dr. Pratt's opinion about the need for either a cane or a walker due to what the ALJ perceived to be normal findings on examination, including findings about gait and station and about normal strength and range of motion.

Plaintiff makes a credible argument that Dr. Pratt's notes, which, as he states, typically show only that the right knee was "examined," are not necessarily indicative of a functional ability beyond that described in Dr. Pratt's subsequent opinions. Many of the findings relied on by the ALJ are not inconsistent with the need to use a cane while walking any distance. The state agency reviewers were unaware that Dr. Pratt had prescribed a cane and, more recently, a walker. The Court sees a substantial overlap between this issue and the Listing issue, and since a remand should be ordered on the former question, the ALJ, on remand, can also revisit the issue of whether the records support the prescription of either a cane or a walker.

VII. Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be sustained to the extent that this case be remanded to the Commissioner for further proceedings pursuant to 42 U.S.C. § 405(g), sentence four.

## VIII. Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge